## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 17 2016, 8:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marianne Woolbert
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of M.K., Minor Child, and K.K., Mother,

K.K.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 17, 2016

Court of Appeals Case No.
48A04-1602-JT-453

Appeal from the
Madison Circuit Court

The Honorable
G. George Pancol, Judge

Trial Court Cause No.
48C02-1505-JT-50

**Kirsch, Judge.**

[1] K.K. ("Mother") appeals the juvenile court's order terminating her parental rights to M.K. ("Child"), contending that the evidence was insufficient to support the termination of her parental rights.[1]

[2] We affirm.[2]

## Facts and Procedural History[3]

[3] Mother and R.M. are the biological parents of Child, who was born on August 2, 2013.[4] On September 23, 2013, Indiana Department of Child Services ("DCS") received a report that Child was at Community Hospital Anderson ("Community Hospital"). DCS learned that Child was intubated and, due to seizure activity, was being transferred to Riley Hospital for Children ("Riley Hospital") in Indianapolis. *Appellee's Br.* at 8. DCS went to Riley Hospital but no additional medical information was available at that time.

[4] Two days later, DCS learned that Child, who was less than two months old at the time, needed surgery because he had "two large spots of subdural blood on

---

[1] Mother also contends that she was not given a sufficient opportunity to participate in services after her release from the Indiana Department of Correction. Mother has made no separate argument on this issue in her brief. Accordingly, we discuss that issue only as it pertains to Mother's claim that the evidence was insufficient to support the termination of her parental rights.

[2] We commend the juvenile court on its thorough findings and conclusions thereon, which greatly facilitated our appellate review.

[3] The court also terminated the parental rights of Child's father, R.M.; however, R.M. does not participate in this appeal. Therefore, we set forth only those facts pertinent to Mother's appeal.

[4] During the termination hearing, a DCS case manager testified that Child was born August 2, 2013. *TPR Tr.* at 10. The juvenile court's termination order appears to have a scrivener's error in that it shows the month of Child's birth as September. *Appellant's App.* at 35.

[his] brain." *Appellant's App.* at 50. A doctor from Riley Hospital Child Protection Program indicated that Child's injuries were "very straight forward, abusive head trauma." *Id.* Child also had "two possible healing fractures, one in the right femur and one in the left foot." *Id.*

When interviewed by law enforcement on September 25, 2013, Mother admitted that she and Child had been living with her boyfriend ("Boyfriend") for about three weeks and that the previous weekend, September 20 through 22, she had used large amounts of intravenous drugs. *Id.* Mother later disclosed that, on Saturday, September 21, she had observed Boyfriend "shaking and screaming at the baby to be quiet." *Id.* Mother explained that Child had seizures on the night of September 22, 2013, and "had been having symptoms for several hours prior to Mother seeking treatment." *Id.* When Mother took Child to Community Hospital, more than twenty-four hours had passed since Child had been shaken. Mother and Boyfriend were arrested and charged in connection with this incident.

Mother subsequently pleaded guilty to Count I, Class D felony neglect of a dependent; Count II, Class D felony maintaining a common nuisance; and Count III, Class B felony neglect of a dependent resulting in serious bodily injury.[5] Count I was merged into Count III, and Mother was sentenced to eight

---

[5] We note that, effective July 1, 2014, our criminal code was amended to, in part, categorize crimes as Levels instead of Classes of felonies. Because Mother committed her crimes prior to July 1, 2014, she was charged according to the statutes in effect at the time she committed her crimes.

years on Count III and three years on Count II. These sentences were ordered to run concurrently, but consecutive to prior convictions for possession of a syringe and neglect of a dependent, that being one of Mother's other two children. Of the eight years, eighteen months were ordered executed in the Indiana Department of Correction ("the DOC"), twelve months served on in-home detention, and six months suspended to probation. *DCS Ex. 3D* at 1. When Mother did not timely register for in-home detention, that privilege was revoked, and the trial court ordered that time to be served on work release.

## CHINS Proceedings

[7] DCS filed a petition alleging Child was a child in need of services ("CHINS"), and on October 4, 2013, the CHINS court detained and removed Child from Mother's care. Two weeks later, during an initial hearing on the CHINS petition, Mother admitted to the CHINS allegations, the following of which are pertinent to this appeal:

> 2. On or about September 22, 2013, Mother brought Child to Community Hospital emergency room with seizure-like symptoms.
>
> 3. Child was transported to Riley Children's Hospital and had to be intubated.
>
> 4. An MRI determined that Child had two large brain bleeds that were the result of abusive head trauma.
>
> 5. Mother admits to observing [Boyfriend] shaking Child on September 21, 2013.

6. Mother failed to seek treatment for Child until approximately 10:45 p.m. on September 22, 2013.

7. Mother admitted to a large amount of intravenous drug use during the entire weekend of injury to Child.

8. Both Mother and [Boyfriend] have been arrested in regards to this incident involving Child.

*DCS Ex. 1D* at 1. Child was determined to be a CHINS.

[8] Following a November 27, 2013 dispositional hearing, the CHINS court determined that Child should be a ward of DCS and remain in his foster care placement. The CHINS court found that Child required ongoing medical care and evaluation, including neurological care and treatment due to Child's injuries. *DCS Ex. 1F* at 1-2. Mother was ordered to comply with a Parental Participation Order, which ordered her to: (1) participate in parenting, substance abuse, and mental health assessments and follow all recommendations; (2) participate in home-based services and follow all recommendations; (3) execute all necessary releases of information for DCS to monitor her progress in services; (4) obtain and maintain adequate housing and a legal source of support or income sufficient for the safe and appropriate upbringing of Child; (5) submit to random drug screens; (6) participate in supervised visitation with Child; (7) notify DCS of any changes in living situation, including household composition, address, and telephone number, within 48 hours of any such change; (8) seek the establishment of paternity for Child; and (9) pay child support in the amount of $43.00 per week. *Id*. at 2-3.

The CHINS court determined that: (1) continuation of Child's residence in the home and care of Mother would be contrary to Child's welfare; and (2) it was in Child's best interests to be removed from the home environment. *Id*. at 3.

[9] In March 2014, DCS filed a Progress Report. Following a hearing, the CHINS court entered an order finding, in part, that during the November 27, 2013 to March 13, 2014 review period, Mother had complied with Child's case plan, had enhanced her ability to fulfill her parental obligations, had cooperated with DCS, and had visited with Child. *DCS Ex.1G* at 1. Mother had also participated in case planning, periodic case reviews, dispositional reviews, and placement and visitation of Child. *Id*. at 2. Mother had participated in home-based services, taken requested drug screens, completed a substance abuse assessment, and participated in many of the recommended treatment classes. *Id*. Prior to the March 2014 hearing, Mother had been placed on in-home detention for two offenses committed on March 20, 2013—neglect of a dependent (involving one of her other two children) and unlawful possession of a syringe. Those charges were pending when DCS first became involved.

[10] The CHINS court conducted a permanency hearing on September 3, 2014. As part of its order, the CHINS court found that Child had spent the previous five months in the same foster home and was progressing well. *DCS Ex. 1H* at 1. Mother had been discharged from home-based services due to "no-show and missed appointments," thus requiring DCS to issue a second referral. *Id*. at 2. Mother had completed a treatment recovery group, a mental health evaluation, and a parenting assessment and was participating in individual therapy. *Id*. At

that point in time, the CHINS court found that, of the available permanency plans, Child's reunification with one of his parents was most appropriate. *Id*.

[11] About six months later, the CHINS court held a review hearing and found that Mother had not complied with the case plan, was incarcerated and had not visited Child, had not enhanced her ability to fulfill her parental obligations, and had not cooperated with DCS. *DCS Ex. 1I at 1*. On March 18, the CHINS court approved the concurrent pursuit of a plan for Child's adoption and one for his reunification. *DCS Ex. 1J*.

[12] On May 26, 2015, DCS filed its "Motion to Modify CHINS Dispositional Decree," requesting the CHINS court to suspend services, including visitation, on the basis that such would be unnecessary because DCS had initiated termination proceedings. *Appellant's App.* at 101. Following a hearing, that motion was granted in an order dated July 2, 2015. *DCS Ex. 1K*. Mother was released from the DOC that same day. *Tr.* at 70. At the September 2, 2015 permanency hearing, the court approved termination of Mother's parental rights and adoption of Child as the permanency plan, finding: (1) Child had been in the same licensed foster care for the previous seventeen months and was progressing well; (2) Mother had been released from DOC in July 2015 after ten months of incarceration; (3) Mother was not in compliance with Child's case plan, nor had she enhanced her ability to fulfill her parental responsibilities; and (4) of the available permanency plans, adoption of Child is most appropriate and consistent with Child's best interests. *DCS Ex. 1L at 2*.

## Termination Proceedings

Meanwhile, DCS filed its petition to terminate Mother's parental rights on May 26, 2015, and the juvenile court held an evidentiary hearing on October 20, 2015. As support for its petition to terminate Mother's parental rights, DCS presented the testimony of three witnesses, one of whom was Mother. The first witness, DCS Family Case Manager Brandi Murphy ("FCM Murphy"), testified that she had been involved in Mother and Child's case since September 2013, "even before the admission and the adjudication of CHINS on [C]hild." *Tr*. at 10. Therefore, she knew that Child "had hemorrhaging [in his brain] and needed to receive surgery . . . from possibly being shaken." *Id*. FCM Murphy was aware that Mother and Boyfriend had been using drugs during the weekend when Child suffered injuries, and that Mother had observed Boyfriend shaking Child more than twenty-four hours before she took Child to Community Hospital.

FCM Murphy testified that Child's injuries continued to impact some of his milestones, such as walking and talking. *Id*. at 12. She described that Child, who was two years old, could not yet walk. He was able to roll over and lift himself up, but had only recently started to crawl. *Id*. He received treatment four times a week, including physical therapy, occupational therapy, and speech therapy. Developmental therapy was also being considered because Child had troubles with feeding and struggled with movement on the right side of his body. *Id*. FCM Murphy explained that most two year olds can walk, are mobile and verbal and, usually, can use utensils. *Id*.

[15]     FCM Murphy spoke of Mother's progress with services prior to September 2014. While Mother had been incarcerated at the commencement of the CHINS case, once released, she started services and was able to complete mental health, substance abuse, and parenting programs. However, Mother was unable to complete visitation or home-based therapy because she was closed out due to her inconsistency.[6] In September 2014, Mother was ordered to serve her sentence at DOC for the crimes that formed the basis for this CHINS. She was released in July 2015 to in-home detention. FCM Murphy testified that, a few weeks before the October 20, 2015 termination hearing, a warrant was issued for Mother's arrest because she had failed to timely sign up for in-home detention. When Mother was arrested, the trial court revoked her in-home detention based on Mother's admission to having violated the terms. The trial court sentenced Mother to one year on work release, and she was ordered to jail to await an open spot in the work release program. *Appellant's Br.* at 11. FCM Murphy testified that, at the time of the termination hearing, Mother was still in jail awaiting that spot. *Tr.* at 32.

[16]     FCM Murphy testified that Mother's inability to successfully complete the visitation necessary to reunite with Child was of particular importance because that would have allowed DCS to determine whether Mother could take care of Child, who had special needs. *Id.* It was FCM Murphy's opinion that Mother

---

[6] The Children's Bureau closed out Mother's visitation in June 2014, and Lifeline restarted it for Mother around that same month. *Tr.* at 19-20. However, the record before us does not state whether Mother consistently attended the Lifeline visitations.

could not comply with any attempted services "in her current state."[7] *Id.* at 34. Child had been in the same foster care placement for over a year and was doing well. *Id.* at 37. FCM Murphy testified that she had visited Child at least once a month and had noted that Child is very attached to and responds to his foster mother ("A.R."). Child will climb up to A.R. and smile. *Id.* at 38. He reaches out to her when anyone else comes into the room and he is "very comfortable in his environment." *Id.* In turn, A.R. is very attentive to Child and his needs, and she makes sure that he attends all of his appointments with doctors and First Steps. *Id.* A.R. has learned techniques for Child's care from First Steps, "and she reiterates those when [service providers] come to visit." *Id.* Also, since Child has challenges with language, A.R. is "trying [to] teach him sign language." *Id.* at 39. FCM Murphy testified that Child would be a good fit with A.R., and A.R. wants to adopt Child; it was in Child's best interest to live in a stable environment, where his medical, mental, and educational needs can be met, and A.R.'s home is such a place. *Id.* at 41.

[17] Child's court appointed special advocate ("the CASA") testified during the termination hearing that she had visited Child at A.R.'s home once a month for more than a year, and that in this placement, Child was doing "better than what the Doctors said he would do." *Id.* at 53. The CASA confirmed that A.R.

---

[7] It is unclear from the record exactly what FCM Murphy was referring to by using the phrase, "in her current state." *Tr.* at 34. FCM Murphy testified regarding her concern about Mother's IQ; however, in response to Mother's objection that this information was hearsay, nothing further was said on the topic. *Id.* at 33.

shows love and affection to Child and gives Child freedom so he can explore his surroundings. At two years old, Child is very much still a baby; he crawls fast, gets into things, climbs, can sit up alone, and can roll over. In regards to children his own age, Child is limited in his speech and his mobility. Child currently attends appointments for speech and with First Steps, and those services must continue in the future.

[18] The CASA testified that she had seen Mother during five different visitations with Child, but Mother did not appear to understand what had to be done to care for Child. *Id*. at 56. Mother seemed unable to understand what the care providers were explaining to her about Child. *Id*. Although Child was paralyzed on his right side, Mother "saw [Child] as normal and healthy and couldn't get the grasp of what had to be done for him." *Id*. at 56-57. The CASA stated that stability was an important part of Child's care and his caregiver has to understand his medical conditions and be available for him full time. *Id*. at 58.

[19] The CASA also expressed concern about Mother's criminal history, the most recent of which was a charge for theft in September 2015.[8] Of particular concern, however, were Mother's convictions for neglect of a dependent on two separate occasions with regard to two of her children. The CASA testified that

---

[8] Mother was involved in three criminal incidents: (1) one prior to DCS involvement, involving neglect of a dependent and possession of a syringe; (2) one that led to DCS involvement, involving neglect of a dependent resulting in serious bodily injury and maintaining a common nuisance; and (3) one in the months just prior to the termination hearing, involving theft. *Appellee's Br*. at 11.

Child cannot "take any more abuse or neglect and [still] thrive." *Id.* The CASA opined that termination of Mother's parental rights and adoption was in Child's best interests. *Id.* at 61.

[20] Mother testified that she completed services pertaining to substance abuse and participated in a sixteen-week program in a wellness and recovery group. *Id.* at 66. Mother maintained that she was visiting with Child twice a week, once with Child alone and the other time with all three of her children. Mother completed only one class that was specifically designed for the care of Child—a class pertaining to seizures, which Mother completed while Child was in Riley Hospital. *Id.* at 67. Mother insisted that she was complying with services from November 2013 until September 2014, including visitation with Child, getting clean drug screens, and meeting with home-based services. She also stated that she participated in individual counseling. *Id.* at 68. In September 2014, Mother was sentenced on the criminal charges pertaining to Child and served ten months with DOC. *Id.* at 68-69. While incarcerated, Mother completed a parenting class and a program called Mothers Against Meth. *Id.* at 69. Mother explained that the parenting class entailed reading a pamphlet and answering questions in a group. *Id.* Mother did not participate in any other programs "that had to do with children." *Id.*

[21] Mother was released from DOC on July 2, 2015. Upon contacting FCM Murphy, Mother learned that her visitation with Child was suspended because DCS had filed a petition to terminate her parental rights; Mother admitted that she had received a copy of the TPR petition while incarcerated. *Id.* at 70-71.

At the time of the termination hearing, Mother was again incarcerated. *Id*. at 71. She explained, "I was staying with a guy I was gonna hook-up to house arrest and uh stuff went wrong and he went to jail so I couldn't do it there[,] I asked for an extension and I guess I got a court date[,] but it went to my old address . . . so I uh got a warrant for that[,] I went to jail for a day over it and I got out and now they are putting me on work release." *Id*. at 71-72.

[22] During the termination hearing, Mother admitted that she has two other children, who live with her mother ("Grandmother"). Mother gave Grandmother temporary custody of the two older children when she "was doing pretty bad about four years ago," and "didn't want them to get taken [into] the system." *Id*. at 76. Grandmother's temporary custody ultimately changed to permanent custody. *Id*. Mother testified that she believed that she could care for Child and all of his special needs. *Id*. at 77. Mother conceded that Child was in "a good place," but argued that her home could also be a good place for Child, because then Child could also see his siblings.

[23] On December 1, 2015, the juvenile court entered its order terminating Mother's parental rights. Mother now appeals.

## Discussion and Decision

[24] "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive— so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). While the Fourteenth Amendment to the United

States Constitution protects the traditional right of a parent to establish a home and raise her child, and thus parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent. *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005)*.* Stated differently, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *In re J.W., Jr.*, 27 N.E.3d 1185, 1188 (Ind. Ct. App. 2015), *trans. denied.*

[25] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* at 148-49. Here, in terminating Mother's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied.* First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id.* If the evidence and inferences

support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[26]     Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> . . . .
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added). A judgment will be reversed as clearly erroneous if upon review of the record there is "a firm conviction that a mistake has been made." *In Re J.W.*, 779 N.E.2d 954, 959 (Ind. Ct. App. 2002), *trans. denied*.

[27] Mother does not contest the juvenile court's conclusions that Child has been out of her care for more than six months or that DCS deems adoption to be a satisfactory plan for the care and treatment of Child. Instead, Mother argues that DCS failed to prove by clear and convincing evidence that conditions that resulted in the removal of Child will not be remedied, that the continuation of the parent-child relationship with Mother poses a threat to Child, and that termination of Mother's parental rights is in Child's best interest.

### Whether Conditions will be Remedied

[28] Mother first argues that DCS did not meet its burden of proving two of the elements under Indiana Code Section 31-35-2-4(b)(2)(B). It is well-settled that because Indiana Code section 31-5-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find that (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied, (2) the continuation of the parent-child relationship poses a threat to the child, *or* (3) the child has been adjudicated CHINS on two separate occasions. *See In re*

*C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003) (emphasis added), *trans. denied*. Therefore, where the juvenile court determines one of the above-mentioned factors has been proven and there is sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for DCS to prove, or for the juvenile court to find, any of the other factors listed in Indiana Code section 31-5-2-4(b)(2)(B). *In re S.P.H.*, 806 N.E.2d 874, 882 (Ind. Ct. App. 2004).

[29] In determining whether the conditions that resulted in Child's removal will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 642-43 (quoting another source). First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id*. at 643 (quoting another source). "In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions," *Bester,* 839 N.E.2d at 152—balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id*. (quoting another source). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id*. (citing another source). "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id*.

[30] Mother acknowledges that Child was removed from her care after he was admitted to Riley Hospital with bleeding on the brain, injuries described by a

doctor as "very straight forward, abusive head trauma." *Appellant's App*. at 50. Mother admitted that she saw Boyfriend shaking and yelling at seven-week-old Child, but waited more than twenty-four hours before taking him to the hospital. *Tr*. at 10-11. Even so, Mother contends that the evidence does not support the juvenile court's finding that the conditions resulting in Child's removal from or continued placement outside the parent's home will not be remedied. As support for her position, Mother argues that she participated in services such as substance abuse assessment, she took part in visitation with Child, and she completed a program for wellness and recovery. *Appellant's Br*. at 12, 13. She also asserts that she participated in home-based services, which consisted of counseling. *Id*. Further, Mother offers that she was "compliant" with services until she was sentenced and incarcerated for the charges pertaining to Child. Mother concedes that, once released from DOC, she failed to timely sign up for in-home detention and was again incarcerated, where she remained while awaiting an open spot in the work release program. Mother offers, however, that she has a plan to "serve approximately 6 months with the chance to modify to 3 months . . . . [She will] get housing with her aunt and continue her job cleaning houses." *Id*. at 12. Mother testified she understood that Child has special needs and "disagreed with testimony that she did [not] see his condition as serious." *Id*. This evidence, Mother claims, demonstrates that "she is not unwilling to cooperate with [DCS], and as such, termination of her rights would be inappropriate based on all of the evidence before the [juvenile c]ourt at the time of the termination hearing." *Id*. at 13. We disagree.

[31] The juvenile court found that Mother was first arrested for neglect of a dependent and possession of a syringe in March 2013. *Appellant's App*. at 38. At that time, she was injecting controlled substances into her body despite the fact that she was four months pregnant with Child. *Id*. One of Child's older siblings was present and within reach of syringes used for injecting drugs, including at least one syringe that was "loaded" with liquified pills. *Id*. From Mother's conduct, the juvenile court found that she demonstrated "a fundamental inability to understand the basic safety needs of a minor child, or to comport her actions to any recognizable standard of safety for her children." *Id*. The court also found that the "purposeful use" of illegal substances while knowing she was pregnant with Child, demonstrated a willingness to elevate her own interests over those of her children, and to do so in such a way that severely jeopardized the life and health of Child. *Id*. at 38-39.

[32] Mother's second arrest was prompted by the offenses connected to the termination of her parental rights. The juvenile court found that Mother witnessed Boyfriend violently shaking seven-week old Child, yet did not seek medical care until the next day, despite seeing seizure-like symptoms. "This delay exacerbated [Child's] medical condition." *Id*. at 39. Mother was sentenced to eight years, but ordered to serve only two years—eighteen months in DOC, twelve months on in-home detention, and six months on probation. Once released from DOC, Mother failed to timely establish in-home detention, causing the revocation of that privilege, and Mother again being incarcerated to await a spot in work-release.

[33] On September 11, 2015, Mother was charged with Class A misdemeanor theft, for stealing property from Walmart. *Id.* at 40. This criminal act occurred five weeks after Mother had failed to comply with in-home detention and mere weeks before the juvenile court's scheduled hearing on the termination of Mother's parental rights to Child. *Id.*

[34] The juvenile court set forth extensive findings regarding Mother's criminal history, use of drugs in the presence of one of her older children, use of drugs all weekend while Child was in her care, failure to timely obtain necessary medical care for Child, and amount of time she was incarcerated during Child's first two years of life. The juvenile court also noted the services Mother completed and her failure to complete visitation. Mother does not challenge the juvenile court's findings. Instead, she argues that the juvenile court erred because: (1) Mother has demonstrated that she is willing to cooperate with DCS; (2) she participated in some services; (3) her incarceration should extend the time that she has to complete services; and (4) the evidence "would not necessarily reflect probabilities of future neglect or abuse." *Appellant's Br.* at 13.

[35] As part of the termination order, the juvenile court concluded:

> Despite the certain knowledge that her good conduct was critical to maintaining a legal as well as physical relationship with [Child], [Mother] was unable to remain in an in-home sentence for more than sixteen days before revocation of that privilege.
>
> Mother's inability to comport her conduct to legal standards despite the risk of further and more restricted incarceration and/or loss of a legal relationship to [Child] demonstrates the

risk to the health and safety of [Child] posed by maintaining the parent-child relationship.

Mother's inability to maintain good conduct despite the risks of failing to do so also demonstrates the likelihood that the conditions resulting in the ongoing removal of [Child] from [M]other's care will not be remedied.

. . . .

Mother's criminal conduct demonstrates that any progress or participation in services while at liberty has had no effect in remedying her tendency to commit crime or lose her liberty, or to enable her to fulfill her parental responsibilities to [Child]. She cannot even fulfill the general obligation to refrain from committing criminal acts despite the risk of long-term criminal incarceration or the loss of a legal relationship to [Child].

*Appellant's App.* at 40. Mother offers many of the same arguments on appeal that she offered to the juvenile court. To this extent, Mother's appeal is a request that we reweigh the evidence, which we will not do. *In re E.M.*, 4 N.E.3d at 642. Here, the unchallenged findings support the juvenile court's determination that the conditions resulting in the ongoing removal of Child from Mother's care will not be remedied. Having found conditions will not be remedied we need not reach Mother's claim that the continuation of the parent-child relationship poses a threat to Child. *In re S.P.H.*, 806 N.E.2d at 882.

### *Best Interests of Child*

[36] Mother asserts that DCS failed to prove by clear and convincing evidence that termination of Mother's parental rights is in Child's best interests. Mother

offers that the juvenile court failed to look to the totality of the circumstances, and instead, considered only the reasons for Child's removal. *Appellant's Br*. at 14; *see In re A.D.S.,* 987 N.E.2d at 1158 (in determining child's best interests, trial court must look to totality of evidence, and not just factors identified by DCS). Mother recognizes that "permanency is a central consideration in determining the best interest of a child," but contends there is no evidence that permanency through adoption would be beneficial to child or that remaining in foster care or with relatives would be harmful. *Id*.

[37] The juvenile court found that Child requires ongoing medical care and evaluation, including neurological care and treatment due to the injuries Child sustained. *Appellant's App.* at 35. Child's right side is paralyzed and, at the age of two, he still suffers from developmental issues related to the physical abuse he suffered. *Id*. at 41, 42. He is developmentally behind others of his same age; he cannot walk, he requires physical, occupational, and speech therapies, and he should receive developmental therapy. *Id*. at 41. Mother does not have a realistic understanding of Child's limitations or needs. *Id*. at 42. Further, Mother has not taken advantage of opportunities, like in-home detention, to make herself available for Child. *Id*. at 41. Even after her in-home detention was revoked, Mother stole property from Walmart. *Id*.

[38] Child was taken out of Mother's care at seven weeks of age and has lived with A.R. for about twenty-five consecutive months. In that home, Child has progressed well and "received extensive and loving care" from A.R., who wants to adopt him. *Id*. The juvenile court agreed with Mother's self-assessment that

her conduct was "not that of a person serious about being a parent." *Id*. at 43. The juvenile court agreed with the opinions of FCM Murphy and the CASA and found that termination of the parent-child relationship and adoption of Child are in his best interest. *Id*. at 45. We cannot say that the juvenile court erred in giving credence to the professionals' opinions that termination and adoption are in Child's best interests. In sum, Mother has failed to establish that the juvenile court clearly erred in concluding that termination of the parent-child relationship and adoption are in Child's best interests.

[39] Affirmed.

May, J., and Crone, J., concur.